J. S. Deese v. Commissioner.
Deese v. Commissioner
Docket No. 58001.
United States Tax Court
T.C. Memo 1958-89; 1958 Tax Ct. Memo LEXIS 141; 17 T.C.M. (CCH) 437; T.C.M. (RIA) 58089; May 19, 1958
Hugh R. Dowling, Esq., Barnett National *142 Bank Building, Jacksonville, Fla., and James J. Freeland, Esq., for the petitioner. Lee C. Smith, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax and additions to tax as follows: Additions to Tax
Sec.
Sec.
Year
Deficiency
293(b)
294(d)(2)
I.R.C. 1939
1945
$7,936.08
$3,968.04
1946
2,434.76
1,217.38
1947
2,324.59
1,162.30
1948
5,487.36
2,743.68
$372.84
In an amended answer filed July 24, 1956, the respondent claimed an additional addition to tax for the year 1947 under section 291(a) of the Internal Revenue Code of 1939 in the amount of $563.40. Although a deficiency and addition to tax were determined for the year 1949 also, the petition did not put that deficiency or addition thereto in controversy. The year 1949 is not before us. The issues for decision are: (1) Whether the assessments of the deficiencies here involved are barred by the statute of limitations; (2) whether and to what extent the petitioner understated his receipts from the timber business during each of the years involved; (3) whether some part of each deficiency *143 was due to fraud with intent to evade tax; (4) whether the filing of an unsigned Form 1040 by petitioner for the year 1947 started the statute of limitations running for that year; and (5) whether the respondent erred in determining additions to tax under section 291(a) for the year 1947 and under section 294(d)(2) for the year 1948. Findings of Fact Some of the facts have been stipulated. The stipulation and exhibits annexed thereto are incorporated herein by this reference. J. S. Deese, hereinafter referred to as petitioner or Deese, resided in Fort White, Florida, during the years here involved. He was 42 years of age at the time of the hearing herein, married, and had five children. His tax returns for the years 1945, 1946, and 1948, and an unsigned form 1040 for the years 1947 were filed with the then collector of internal revenue for the district of Florida on or before the 15th of March of the following year. The deficiency notice herein was mailed to the petitioner on March 3, 1955. Deese had a high school education and, after working for about 2 years, spent part of one semester at the University of Florida pursuing a course in civil engineering. He has been in the *144 lumber business since he was 17 years old, first with his father and later as a sole proprietor. During the years in question, Deese was engaged in selling railroad crossties, veneer blocks, and other similar items which he bought from others or produced himself. His business covered the north central part of Florida, including parts of Hamilton, Columbia, Union, Lafayette, Gilchrist, and Alachua Counties. When crossties are sold by tie producers, the producer is required to deliver them to a specific railroad siding and load them aboard railroad cars. The machine used for this purpose is known as a tie-loader. After the ties are loaded, a railroad inspector examines them for quality and fitness and makes out a "Cross Tie Certificate," hereinafter called a certificate, which contains a complete description of number, grade, size, and price of all ties purchased. These certificates, when properly endorsed, become sight drafts on the issuing purchaser. During the years in question, Deese possessed a tie-loader, with which he loaded ties onto railroad gondola cars at various sidings. Most of these ties were purchased by petitioner from other producers, some he produced himself, and *145 some were produced by S. W. Deese and C. B. Terry as later described with more particularity. Deese paid by check for most of the crossties purchased by him. Occasionally, when the producers requested it, he paid them in cash. At times Deese made loans to these crosstie producers to enable them to buy timber leases, equipment, or meet their payrolls. These loans were repaid by means of deductions from the purchase price paid by Deese for later purchases of crossties. He also occasionally paid for crossties before they were accepted by the railroad inspector. Any necessary adjustments were accomplished on later purchases of crossties by Deese. Deese, S. W. Deese (his father), and C. B. Terry (his brother-in-law) were all in the timber business. Before Terry acquired a tie-loader in 1947, Deese was the only one of the three who possessed one. At times, in order to get better prices for their crossties and veneer blocks, they pooled their production and sold to purchasers under the name of Deese Tie Company, hereinafter referred to as the company. The certificates covering such sales were made out to the company. None of the purchasers knew the identity of the members of the company. *146 Most of the certificates were delivered to Deese and endorsed by him. Occasionally, S. W. Deese or Terry received the certificates. Each man kept a record of his part of the shipment, and the one who received and deposited the certificate paid the others for their shares either by check or in cash, if cash was requested, or by appropriate credits. The only pooling done was in selling crossties and veneer blocks. Each man's operations, other than those involved in pooled sales and shipments, were independently run. No partnership return was ever filed for sales made by the company. By means of canvassing Deese's known customers and assembling the available data supplied by them, respondent's agents found that many payments made to Deese or to the company were not included as receipts in Deese's books and records. The following checks and certificates payable to Deese or to the company were endorsed by him, deposited in his bank account, and not recorded on his books or reported as income: Year
No. of items
Amount
1945
27
$ 3,675.17
1946
38
10,293.86
1947
82
25,465.36
1948
87
43,014.22
Deese reported the following payments from S. W. and Terry *147 representing his share of pooled shipments: No. of
Year
Payor
checks
Amount
1946
C. B. Terry
$1,576.75
1947
C. B. Terry
1
54.95
1947
S. W. Deese
6
1,538.67
1948
S. W. Deese
3
1,331.52
In addition to this pooling arrangement, Deese on occasion loaned crossties to Terry and at least one other producer when they lacked a specific amount for their shipments. These loans were repaid either in kind or by check or cash. Neither the loan nor the repayment was entered in Deese's sales or receipts. Deese also performed services for other producers and allowed them to use his equipment. He was paid for these services and use of his equipment but considered that he made no profit therefrom, and he included on his books neither the receipt of cash or check nor the expenses incurred in the transaction. Deese did not report at least the following amounts representing payment for services: No. of
Year
Payor
checks
Amount
1947
C. B. Terry
21
$2,468.73
1948
C. B. Terry
8
633.15
1948
J. K. Douglas
11
2,524.87
In 1942, after the respondent had made inquiries of him concerning his income taxes for the year 1941, *148 Deese sought the advice of an attorney who was also the president of the Columbia County Bank in Lake City, Florida. This attorney recommended that Deese consult George L. Colburn who, at the time, was employed by the bank as an auditor and who had been employed as an auditor by the State of Florida. Colburn was the best accountant then in Lake City and held himself out as an income tax expert, the only such person in Lake City, Florida. Colburn advised Deese as to what books and records to keep and showed Deese how to keep them. Thereafter, for every year through 1947, Colburn prepared Deese's tax returns from his books, canceled checks, and bank statements, most of which were left with Colburn. When the returns were ready, Colburn notified Deese who signed and mailed them. In February 1949, when Deese went to see Colburn with regard to his return for the year 1948, he was informed that Colburn was critically ill and would not be able to prepare his return. Deese removed his records from Colburn's office and, using his prior returns as a model, prepared his own tax return for 1948. At this time, Deese was expanding the production part of his business and his daughter, Betty Sue, *149 was seriously ill with virus pneumonia. Deese was unaware of the provision in the Internal Revenue Code permitting the filing of a joint return. His 1948 return was filed on an individual basis. During the years in question, Deese maintained bank accounts in 10 banks in 8 different towns in central Florida in which he did business. In addition, there was a savings account in his wife's name. Deese's vendors preferred to be paid with checks drawn on their own banks or, at times, in cash because some local banks charged a fee for deposit items drawn on other banks. The balances in each of these accounts as of December 31, 1944, 1945, 1946, 1947, and 1948 were as follows: Assets
12-31-44
12-31-45
12-31-46
12-31-47
12-31-48
First National
$ 724.16
$ 4,958.35
$ 4,985.89
Bank, Alachua,
Florida
Branford State
3,534.40
4,811.27
4,806.27
Bank, Branford,
Florida
First National
4,290.57
$6,274.29
$6,716.14
4,310.78
3,604.35
Bank,
Gainesville, Fla.
First National
356.39
5,000.00
4,900.00
3,933.25
4,490.90
Bank, Lake City,
Fla.
Columbia County
4,983.88
7,034.48
5,124.94
4,899.94
5,526.58
Bank, Lake City,
Fla.
State Exchange
4,959.10
5,000.00
4,992.30
4,516.60
4,732.15
Bank, Lake City,
Fla.
Farmers &
1,641.20
1,641.20
1,397.65
1,397.65
1,397.65
Merchants Bank,
Monticello, Fla.
Bank of Newberry,
1,978.35
1,121.20
Newberry, Fla.
Farmers and
353.51
1,456.95
5,878.29
2,470.11
2,851.94
Merchants Bank,
Trenton, Fla.
High Springs
15,582.50
15,999.01
18,323.91
15,593.42
32,134.77
Bank, High
Springs, Fla.
High Springs
Bank, High
Springs, Fla.
Mrs. J.S.D.
1,816.72
1,749.52
1,967.31
1,714.51
1,731.29
$40,220.78
$44,155.45
$49,300.54
$48,605.88
$67,382.99
*150 Deese kept a single-entry set of books consisting of a salesbook and, in some years, a daybook, a "tie" book, and an account book. He sometimes carried the daybook and the "tie" or account book with him. The entries in these books were all made by Deese, with the exception of occasional entries made by his wife under his direction. The salesbook purportedly contained a record of all receipts and disbursements made by Deese. When the books were not in his personal possession they were at his home. Deese maintained no office but worked on his books either on the job or at home. Deese kept no large sums of undeposited cash other than what was necessary for his normal business operations. He received checks, certificates, and cash either at the time that delivery of lumber was made at a railroad siding or in the mail shortly thereafter. It was his habit when depositing checks to retain some of the proceeds in cash to meet operating expenses and payrolls. Whatever cash was not used for such expenses was either retained for the following week's expenses or deposited in one of his accounts. Deese transferred cash from one bank to another whenever one account was low. The checks were entered *151 on the books either before or after they were deposited. When he did not have the books in his possession, Deese would cash or deposit a check and note the details of the check on a scrap of paper. Entries were made later from these scraps of paper. Sometimes these scraps were misplaced or lost and the check proceeds never entered on the books. There is no correlation between the salesbook and any of the other books. The salesbook did not contain all sales made by Deese. There is no way of telling what the entries in the "tie" book or account book represent, i.e., advances, payment, repayment, or even whether in some instances they represent cash or ties. Deese's books and records were inadequate and did not reflect a true picture of his business. Respondent determined, on the basis of a net worth calculation, that petitioner had the following net income and had understated his income as follows: Net income
Corrected
Under-
Year
reported
net income
statement
1945
$7,807.44
$24,993.08
$17,185.64
1946
4,613.78
13,415.63
8,801.85
1947
4,652.45
13,126.30
8,473.85
1948
7,986.76
23,441.87
15,455.11
Because of concessions made at the trial, *152 respondent made certain adjustments to the net worth statement as determined. The adjusted net worth statement is as follows: 12-31-44
12-31-45
12-31-46
12-31-47
12-31-48
Assets: Cash in banks
$40,220.78
$44,155.45
$49,300.54
$48,605.88
$ 67,382.99
U.S. Treasury
7,050.00
10,800.00
14,550.00
18,300.00
22,050.00
bonds - Series
"E"
Insurance
5,459.31
10,323.31
10,323.31
10,323.31
10,323.31
policies - at
cost
Equipment -
4,593.39
3,757.17
7,401.39
10,903.87
14,087.00
Automobiles and
trucks
Real estate
4,517.50
2,955.00
2,955.00
2,880.00
4,110.00
Real estate
sales contract
receivable: Guy S. Horton
1,350.00
Loans
receivable: Herbert R. Dear
2,500.00
500.00
Russell Walker
250.00
Retained title
contract
receivable: C. R. Timmons
700.00
100.00
Total assets
$61,840.98
$74,040.93
$84,880.24
$93,513.06
$118,453.30
Liabilities and
reserves: Liabilities: Rayonier
2,148.80
2,071.98
Incorporated
(loan)
Reserve for
depreciation: Automobiles and
3,660.35
3,052.33
1,291.96
2,671.46
5,841.18
trucks
Total
$ 3,660.35
$ 3,052.33
$ 3,440.76
$2,671.46
$ 7,913.16
liabilities and
reserves
Net worth
$58,180.63
$70,988.60
$81,439.48
$90,841.60
$110,540.14
Preceding year
58,180.63
70,988.60
81,439.48
90,841.60
net worth
Increase in net
$12,807.97
$10,450.88
$ 9,402.12
$ 19,698.54
worth
Add: Federal income
1,391.80
598.19
164.74
(10.50)
taxes paid
(refunded)
Investors
Diversified
Services, Inc.
(payments)
176.40
176.40
176.40
176.40
Life insurance
84.16
115.16
348.20
346.20
premiums
Estimated living
3,100.00
3,400.00
3,700.00
4,000.00
expenses
Subtotal
$17,560.33
$14,740.63
$13,791.46
$ 24,210.64
Less: Nontaxable
portion of
long-term
capital gain
618.75
825.00
165.16
268.77
Corrected
$16,941.58
$13,915.63
$13,626.30
$ 23,941.87
adjusted gross
income
Less: Standard
500.00
500.00
500.00
500.00
deduction
Corrected net
$16,441.58
$13,415.63
$13,126.30
$ 23,441.87
income
Less: Net income
reported per re-
turn or adjusted
gross income on
unsigned Form
7,807.44
4,613.78
4,652.45
7,986.76
1040 for 1947
Understated net
$ 8,634.14
$ 8,801.85
$ 8,473.85
$ 15,455.11
income
*153 At the hearing in this case petitioner submitted his own net worth statement. The differences between petitioner's net worth statement and respondent's adjusted statement are as follows: Cor-
Cor-
rected ad-
rected ad-
justed gross
justed gross
income per
income per
Differ-
Year
respondent
petitioner
ence
1945
$16,941.58
$ 9,609.27
$7,332.31
1946
13,915.63
10,010.80
3,904.83
1947
13,626.30
13,180.08
446.22
1948
23,941.87
23,084.22
857.65
The differences are due to a disagreement as to the amounts of Deese's accounts receivable during each of the years involved and the proper treatment on the net worth schedules of a timber lease purchased in 1944. On September 17, 1944, Deese purchased a timber lease from the estate of L. C. Gracy for $7,500 giving him the right to cut hardwood timber on the land situated in Columbia County, Florida, for 2 years. The timber was cut ratably over the period of the lease. The following loans were due and owing to Deese as of December 31, 1944 and 1945: December 31, 1944
G. Horton
$3,237.57
December 31, 1945
C. R. Timmons
824.05
December 31, 1945
Will White
127.25
*154 On July 7, 1952, pursuant to notice sent to Deese by mail, an agent and special agent interviewed and received a sworn statement from Deese at his home in Fort White. The interview was interrupted after 1 hour and 25 minutes. At that time, after Deese had informed the agents that he had safe-deposit boxes, the agents suggested that they be allowed to examine their contents. The agents and Deese inspected the safe-deposit boxes and the United States Government bonds that Deese kept there. The interview was continued the next day. At that time Deese turned over some records to the agents and promised to look for more. At a later date, when the special agent went to Deese's home, he was given a cardboard box containing various records for the years here in question. Deese was very cooperative. He answered all of the agents' questions fully and frankly, supplied them with all the information in his possession, and complied with all their requests. Deese was not a member of a partnership or a corporation during the years in question. Neither Deese nor his wife ever received or made gifts of more than $1,000, or received any nontaxable income. Deese filed the following declarations *155 of estimated tax and paid the following income taxes for the years in question: Estimated
Date
Income
1945
$1,340.00
Mar. 15, 1945
$1,391.80
1946
718.50
Mar. 15, 1946
598.19
1947
300.00
Mar. 15, 1947
164.74
1948
81.00
June 15, 1948
(10.50)
No part of the deficiencies for any of the years in question was due to fraud with intent to evade tax. The returns for 1945, 1946, and 1948 were not false or fraudulent with intent to evade tax. The deficiencies for the years 1945, 1946, and 1948 are barred by the statute of limitations. Petitioner's adjusted gross income for the year 1947 was $13,626.30. Opinion KERN, Judge: Because the assessments of the deficiencies in tax and additions thereto for the years 1945, 1946, and 1948 are barred by the statute of limitations unless the returns were false and fraudulent with intent to evade tax, we will first consider the issue of fraud. The burden of proving fraud is on the respondent. Petitioner does not deny that his income was understated. Indeed, petitioner's net worth statement agrees with respondent's net worth statement in all particulars, with the exception of certain accounts receivable which *156 petitioner alleges were due and owing to him during the years in question and the cost of a timber lease. Although the differences between the net worth statements are sizable for the years 1945 and 1946, they are less than $1,000 each for the years 1947 and 1948. Respondent relies mainly on the consistent understatements by petitioner of his gross income and the consistent decreases of tax due as shown on the declarations of estimated income tax filed by petitioner. Petitioner's books and records were, to say the least, inadequate. Although the single-entry system set up for him by George Colburn may have been adequate to reflect a true picture of petitioner's operations if adequately kept, the haphazard entries made by petitioner and his wife are incomplete and, in place, indecipherable. Petitioner kept the books and records personally and made all entries therein with the exception of occasional entries made by his wife. Petitioner did not enter all of his receipts. It was his habit to mark down information about checks received on scraps of paper when the checks were cashed and make the necessary entries sometime later in his salesbook. These scraps of paper could be, and were, *157 occasionally lost or overlooked. At the hearing in this case petitioner admitted that certain sales were overlooked and not entered in his salesbook. Petitioner's knowledge of the rudiments of bookkeeping was inadequate or nonexistent. It was his opinion that any receipt of money representing merely reimbursement for services performed, machinery used by others, or timber loaned to other producers, but not including any item of profit, did not have to be entered on his books. At the hearing in this case, in response to a question as to why certain transactions had not been reported, Deese stated: "He had a brokerage outfit himself and I had one and sometime I'd send stuff under him. He'd send it under me. And it was a deal, so to speak. I didn't make nothing off of him. He didn't make nothing off of me, and when I sold that stuff I didn't charge out the checks that I made to [him]. I didn't put down what I got from him. I didn't charge them out, either one." When asked his reason for not entering these transactions in his books and records, Deese stated: "I thought if you didn't make anything out of it you didn't have to put it down." Petitioner cooperated fully with respondent's *158 agents, even to drawing their attention to three bank accounts which they had overlooked. He was in no way evasive and answered their questions straightforwardly. Respondent points to the results of his partial canvassing of petitioner's customers which show that petitioner had unreported sales which resulted in understatements of gross income in substantial amounts in each of the years in question as proof of a fraudulent plan. Petitioner has consistently maintained, both to respondent's agents and at the hearing in this case, that shipments made under the company name were pooled shipments, the proceeds of which were divided between the petitioner, his father S. W. Deese, and his brother-in-law C. B. Terry in proportion to their shares of the pooled shipments. Nor was this testimony uncorroborated. However, since respondent based his determination of deficiencies on the net worth computation which is not questioned by petitioner with the exceptions mentioned above, we think it unnecessary to determine petitioner's share of the proceeds of sales made under the company name. Respondent also relies on the decreases shown in tax due on petitioner's declaration of estimated income *159 tax for the years in question as evidence of a fraudulent scheme. However, the record clearly indicates that petitioner relied on George Colburn for advice on all of his tax matters. Although the record does not specifically indicate who prepared the declarations of estimated income tax, it is our opinion that they were either prepared by or under the direction of Colburn. During the years involved Colburn had all or part of petitioner's records at his office. Considering the petitioner's lack of knowledge of income tax matters and his failure to file a joint return for 1948, the year in which he prepared his own return, we cannot conclude that the decreases shown in tax due on the petitioner's declarations of estimated income tax for the years in question constituted themselves or in conjunction with other facts of record clear and convincing evidence of fraud with intent to evade tax. Petitioner's testimony at the trial of this case was frank and candid. His demeanor on the witness stand was excellent. Petitioner impressed us as being essentially honest, with considerable ability as a producer and broker in a small segment of the lumber industry, but with obviously limited education *160 and with no conception of proper accounting methods. He maintained no office and employed no bookkeeper but was occasionally assisted in connection with his "books" by his wife. Petitioner was primarily concerned with the producing operations of his business which were carried on in a territory of considerable size in northern Florida. His wife was primarily concerned with five children. The business itself was legitimate and no question arises as to any blackmarket operations or other illegal sources of income. Petitioner lived in a rural section of Florida, where it was difficult to obtain competent accounting services. The record shows that he obtained during 3 of the 4 years here involved the advice and services of the only "tax expert" in his community with whom petitioner cooperated fully, as he did with all of respondent's agents with whom he came in contact. In spite of the advice and services of this "tax expert," petitioner's books and records were deplorably inadequate. Upon the record before us it is obvious that petitioner was grossly negligent. However, although petitioner's understatements of income for the taxable years may raise a suspicion of fraud, we conclude *161 after a careful consideration of the entire record that respondent has not proved by clear and convincing evidence that the return for any year was false or fraudulent with intent to evade tax. Therefore, we conclude that the deficiencies and the additions thereto for the years 1945, 1946, and 1948 are barred by the statute of limitations. Section 276(a), I.R.C. 1939. The situation with reference to the year 1947 is different. For that year petitioner timely filed an unsigned and unverified copy of Form 1040. The pertinent provisions of the Internal Revenue Code of 1939 are set out in the margin. [1] Section 51(a), as of the year 1947, made mandatory the filing of a return which "[contains] or [is] verified by a written declaration that is made under the penalties of perjury" for every individual having a gross income of $500 or more for the taxable year. A return which does not contain such written declaration or verification does not satisfy this section and does not start the running of the statute of limitations contained in section 275(a). Lucas v. Pilliod Lumber Co., 281 U.S. 245, affirming 7 B.T.A. 591; Theodore R. Plunkett, 41 B.T.A. 700, *162 affd. 118 Fed. (2d) 644 (C.A. 1, 1941); Roy Dixon, 28 T.C. 338 (1957). Petitioner argues on brief that: "[The unsigned Form 1040] was accepted by Respondent and the tax shown on the said return was retained by *163 Respondent and no question was raised as to its validity until Respondent filed his Amendment to Answer with this Court on July 25, 1956. It is therefore submitted that Respondent is estopped under these facts from now asserting that this return for 1947 is not a valid and proper return." This argument was in effect considered and rejected by the Supreme Court in the Pilliod Lumber case, supra. We are of the opinion that the unsigned Form 1040 filed by petitioner for the year 1947 was not a return for the purpose of starting the running of the statute of limitations. Roy Dixon, supra. Petitioner's net worth statement concedes the major portion of the deficiency for 1947, as shown in the respondent's net worth statement as adjusted. The difference in understated income between the two net worth statements, amounting to $446.22, represents a decrease in the amounts of loans receivable claimed by petitioner as of December 31, 1946 and 1947. These loans receivable were ostensibly taken by petitioner's accountant from petitioner's account books. We have already expressed our views concerning the inaccuracy of petitioner's books. There was no proof supplied by petitioner's *164 testimony as to the amounts of any outstanding loans due him as of either December 31, 1946 or 1947. Accordingly, we conclude that there is a deficiency in petitioner's income tax for the year 1947 as computed in respondent's amended net worth statement. Respondent determined additions to tax for the year 1947 under sections 293(b) and 291(a). Our holding that there was no fraud with intent to evade tax for any of the years in question is determinative of the addition to tax under section 293(b). Section 291(a) provides an addition to tax for failure to file a return "unless it is shown that such failure is due to reasonable cause and not due to willful neglect * * *." Petitioner's unsigned Form 1040 for the year 1947 was prepared by Colburn. As was customary, Colburn notified petitioner that the form was ready for filing. Petitioner received the form, but mailed it without signing it. The only explanation given by petitioner was "in the haste of getting it off I just forgot to sign it." Inadvertence or oversight does not constitute reasonable cause within the meaning of this section. Theodore R. Plunkett, supra.Petitioner has not upheld his burden of showing reasonable *165 cause. Decision will be entered under Rule 50. Footnotes
1. SEC. 51. INDIVIDUAL RETURNS. (a) Requirement. - Every individual having for the taxable year a gross income of $500 or more shall make a return, which shall contain or be verified by a written declaration that it is made under the penalties of perjury. * * * [Before amendment.] SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩